# STATE *v*. MCPHAIL.

(Division B. April 18, 1938. Suggestion of Error Overruled June 13, 1938.)

[180 So. 387. No. 33159.]

Lotterhos & Travis, of Jackson, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for appellant.

**J. H Garth,** of Hazlehurst, for appellee.

R. L. Jones, of Brookhaven, and M. S. McNeil, of Hazlehurst, for appellee on suggestion of error.

Argued orally by W. D. Conn, Jr., and Cecil Travis, for appellant and by J. H. Garth, for appellee.

Griffith, J., delivered the opinion of the court.

Immediately across Pearl river, adjacent to the municipal limits of the city of Jackson, there is situated an unincorporated community formerly known as East Jackson, but now more generally known by the name "The Gold Coast," as being more definitely descriptive. This area extends about half a mile eastward from the Farish bridge along Highway No. 80, and thence nearly the same distance along the Fannin road, and also along highway No. 49 for a distance about one-fourth of a mile from the underpass, which is near the junction of said highways. The area is in Rankin county.

In this area for some time, and in numerous places, intoxicating liquors have been openly displayed and sold in the manner as if in licensed saloons, and gambling in its most vicious forms has been carried on. The salient facts with reference to the general situation in the area in question have persisted for such a considerable length of time; have been of such glaring notoriety and

have aroused such general public interest; have been the subject of such extensive public comment both in the daily and weekly press and of common conversation throughout the state; have been so open and flagrant and without dispute anywhere that the court may notice as a matter of current history the import of said facts, when taken in connection with the evidence before us dealing with those facts. We shall make further reference thereto at subsequent points in this opinion, particularly as regards what we consider to have amounted to a substantial breakdown in the enforcement of the law by the local executive officers in that area.

On December 8, 1936, the Governor issued an executive order in which he recited that "in view of the conditions existing in East Jackson, Rankin County, Mississippi," it was deemed necessary to send therein a sufficient detachment of the national guard of the state "for the purpose of assisting in the enforcement of the criminal laws of the state," and he did send such a detachment under command of the Adjutant General. An officer in the National Guard made an affidavit before a justice of the peace of the district for a search warrant for a search of the premises of appellee, the affidavit making all the necessary allegations requisite of a search warrant for intoxicating liquors. The search warrant was duly and regularly issued by the said justice of the peace; was placed in the hands of the said officer of the National Guard; was in an orderly manner duly executed by him or under his directions, and was returned by an indorsement by the officer of the National Guard who executed it, of the manner of its execution in the same form as if the execution and return had been by the sheriff.

In the execution of the search warrant a quantity of intoxicating liquors was found and seized, and much other evidence was obtained of violations of the law in keeping with the stated conditions in that area. Subsequent-

ly the district attorney of the judicial district filed and prosecuted his bill under section 2007, Code 1930, to abate the place of business of appellee as a common nuisance. The evidence which he introduced in support of the bill was that obtained by the members and officers of the National Guard in the execution of the search warrant as aforesaid. The chancellor ruled that the facts were not sufficient to authorize the interference of the militia and he excluded the evidence as having been illegally obtained, and dismissed the bill. The state has appealed.

Section 123, Constitution 1890, provides that "The governor shall see that the laws are faithfully executed." Section 217 of the Constitution ordains that "The governor shall be commander-in-chief of the militia, except when it is called into the service of the United States, and shall have power to call forth the militia to execute the laws, repel invasion, and to suppress riots and insurrections." Article 9 of the Constitution requires the Legislature to provide a state military force, and for the maintenance thereof; and section 4817, Code 1930, in dealing with the powers of the Governor, enacts, inter alia, that he "may call out the militia to execute the laws, to suppress insurrections or riots, and to repel invasions." But section 9 of the Constitution declares that "The military shall be in strict subordination to the civil power."

We are not here concerned with the powers and duties of the Governor, nor with the conduct of the militia, in respect to the suppression of insurrections or riots, or the repulsion of invasions or mobs, or the like. We deal solely with the constitutional and statutory powers of the Governor, and of the militia, in the execution of the laws. And that means also that we lay aside any consideration or discussion of martial law, or of the power of the Governor to declare martial law in any given area, or the reasons or exigencies which will authorize such a declaration.

The constitutional and statutory provisions requiring the Governor to see that the laws are executed have no obscure or technical meaning; neither were they intended as a mere verbal adornment of his office. State v. Dawson, 86 Kan. 180, 187, 119 P. 360, 39 L. R. A. (N. S.), 993. They mean what is in the ordinary import of the language used, to wit, that the laws shall be carried into effect, that they shall be enforced. And when this language is taken in connection with section 9 of the Constitution, it means, of course, as was said in Henry v. State, 87 Miss. 1, 38, 39 So. 856, not that there shall be an arbitrary enforcement by the executive of what he may consider the law to be, but the enforcement of judicial process that is, the enforcement of a right or remedy provided by the law and judicially determined and ordered to be enforced, and it includes criminal as well as civil process; and the term "process" is used here in its broadest sense, so long as it is a judicial process. All these provisions, when taken together, mean that whatever the Governor does in the execution of the laws, or whatever members of the militia do, under such authority, must be as civil officers, and in strict subordination to the general law of the land.

A permeating feature in our State Constitution, and in all State Constitutions, is that primary local authority shall be preserved, so far as practically possible. The execution of civil and criminal process—the execution of the laws—was and is no exception to this structural rule. It was foreseen, however, by the framers of the Constitution that for one cause or another, local conditions would sometimes arise which would render the local authorities powerless to enforce the laws, or unwilling or afraid to do so. It was to meet such conditions, as one of its purposes, that the constitutional and statutory authority which we have above mentioned in respect to the execution of the laws was vested in the Governor. The Constitution makers did not leave any

such loophole as to permit statutes enacted for general observance throughout the state to be set aside, or in practical effect repealed, in any particular section or area by the device of a failure or refusal of the local authorities to enforce such statutes.

Thus and for the stated reason, the chief executive was given the authority and it was made his duty to act to enforce the laws, duly and constitutionally enacted, in every portion of the state, so that every citizen and all property would have the protection of the laws and that every criminal statute should be observed. Thus the power to enforce the laws is not left as a matter of finality to the discretion of the local authorities or the local inhabitants; but power was placed in the head of the executive department to act, in case of need, for the whole state. The Governor is an executive officer in every county of the state; and he may set the enforcement machinery in motion and thereby determine to whom the civil process may be directed for execution, when that has become proper on account of failure, neglect, or inability of the local executive officers to act. Every power at his command given by the Constitution and statutes may be brought into play so far as needed to effect the enforcement of the law. He may select the military as agents to act for him; for it is manifest that he cannot personally do all executive acts. The militia was established for the use of the civil power, when necessary, and the Governor is a civil officer and the militia, under his control, are civil agencies, in the execution of laws.

As was said by the court in Franks v. Smith, 142 Ky. 232, 134 S. W. 484, L. R. A. 1915A, 1141, Ann. Cas. 1912D, 319: ''Primarily, the enforcement of the law is with the local civil authorities, but at times they are too weak to control the lawless elements that exist in every society, and at other times they might be in sympathy with the forces who want to take the law into their own hands. But, whatever the reason that may exist for the

failure or inability of the local civil authorities to suppress violence and disorder, when it comes to pass that they cannot or will not do it, then it is not only the right but the plain duty of the Governor to act. Ours is a government of law. Under its authority and through its agencies alone wrongs must be redressed and rights protected. Unless this were so, there would be no assurances of peace or quiet for the law-abiding and order-loving, who constitute so large a part of our people. The life and property of the citizen would be insecure, and the lawless, reckless, and violent would be at liberty to exercise at will their disregard of civil authority.'' It will be noted that the above language was addressed to occasions of violence and disorder, but it applies as well to situations where there is a breakdown of the enforcement of the laws, although not attended by any actual violence, or disorder of a violent nature.

But as we have already said, there is no such allowance as that there shall be any arbitrary enforcement by the executive of what he may consider the law to be; neither is there to be any sending of troops among the people because the executive may believe and have reason to believe that the laws are not being as diligently enforced as he considers they ought to be. The presence of armed troops in times of peace is a demonstration of centralized power which sets up fear in the ordinary citizen that his constitutional liberties are somehow being imperiled. Too much history of the past casts its shadow for the people to feel otherwise. It was never the purpose of the Constitution, therefore, that the militia should be sent to execute the laws, merely because they are not being at all times diligently executed or perfectly enforced in the particular area in question. This was what the learned chancellor had in mind in his able and eloquent opinion. We differ from him only that we believe he held too strictly, while at the same time we must unhesitatingly commend his caution.

A fair measure of deference must be accorded to the

local authorities, but when, as here, the Governor has sought by representations to, and requests of, the local authorities that the law be enforced, and they fail to do so; when their failure becomes tantamount in substantial results to a refusal, or to no more than a futile pretense; when the condition exists and persists for that length of time which makes it clearly apparent that no dependence is to be placed upon the local executive officers and that they either cannot or will not enforce the laws, so that as respects all offenses of a certain class or classes, or as to any class or classes of civil process, there has been a substantial breakdown of local enforcement, then the power and duty of the Governor arises to send the executive agents with which the law has armed him, to wit, the militia, not at all to supersede the law, but to enforce it, the members of the militia to perform the duties which the local executive officers would and could perform were they immediately present and were they performing their duties as they ought to do and ought to have done.

It follows from what has been said that when under conditions such as stated in the foregoing paragraph, the Governor has ordered out the militia to enforce the law, a search warrant issued by a justice of the peace, as was the case here, or by any other authorized judicial officer, may be placed in the hands of any member of the militia who by his rank has any executive authority, and that member as ''a lawful officer'' may execute the warrant or have it done under his supervision, and make return upon it as the sheriff of the county or a constable of the district might and should do, and with the same effect. The search warrant in this case was legally executed, and it was error to exclude the testimony obtained during its execution.

Some argument is made that the proclamation of the Governor in ordering out the militia is insufficient in its recitals. Such an order does not have to contain any particular recitals. It is enough that it was an order,

and that the facts de hors justified its issuance and its execution. And it is argued that the conditions mentioned in section 5540, Code 1930, were not here present. That section, when its conditions are present, makes it obligatory on the Governor to call out the militia. It has nothing to do, in the main, with the constitutional or statutory sections which deal with the particular and separate subjects here under consideration, that is, with the execution of the laws.

On the other hand, it has been argued that when the Governor calls out the militia, his decision whether the exigency is such as to authorize him to do so is solely for his determination and is not subject to judicial question or review. We do not agree with that contention. Official action, whether the officer be of the highest or the lowest grade, must be within the Constitution and the laws, and the facts must be such as to uphold or justify the exercise of the official authority which in a given case is exerted. If any officer, be he high or low, attempt to exercise an authority not legally vested in him, or if he attempts to do so upon a state of facts which does not bring the asserted authority into existence, his action thence is as much the subject of judicial review and remedial rectification as is the action of any private person within the jurisdiction of the state.

It is true that there are certain features of official action which are of purely political concern, or which deal with what are merely the managerial problems of the government or of its subdivisions, or which involve divers other matters that are nonjusticiable in their nature, as, for instance, those which are legislative in their ultimate characteristics, and wherein so long as the officers and agents of the government act within the boundaries of the field of their appointed duties, their actions and decisions are not reviewable by the courts; and it is true that no writ of injunction or mandamus or other judicial remedial writ will run against the Governor or any member of the Legislature, in his offi-

cial capacity; but whenever they, or any of them, or any other officer acting or assuming to act for the government, puts into action any agency which comes into collision with the private personal or private property rights of any person within the jurisdiction of the state, such personal and property rights of the citizen and their infringements are always subject to inquiry and redress by the courts, as against any unauthorized act by any officer of the state, whatever his character and rank may be, and all appropriate judicial process will be directed to and against his agents or agencies—and against the officer himself, other than those expressly above mentioned; and the courts will determine for themselves not only the law, but ultimately also whether there be justifying facts, however much may be the weight, prima facie, which the judicial department will yield to the findings of fact by an executive or administrative officer as those upon which he has acted.

By section 24 of the Constitution of this state, it is provided that "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law; and right and justice shall be administered without sale, denial, or delay." This, of course, refers to legal injury and has been uniformly construed to mean that it affords a judicial remedy for every unlawful violation of any one of the named rights. Within the limits of the power conferred upon him by the Constitution and the laws, the Governor is not subject to control by the courts, nor, as already mentioned, can any mandamus, prohibition, or injunction direct or restrain him in the exercise of his power. But any act which may injure a citizen in his legal rights, under the law, is subject to redress in the courts. Under our form of government there is no arbitrary power, that is to say, no power above the law; but every unlawful power is the subject of scrutiny by the courts, where it operates to the legal hurt of any citizen, however humble. For any unlawful imprisonment, the

superior writ of habeas corpus lies to inquire into the legality of the imprisonment or detention and to release therefrom when unwarranted by law; and it is provided in section 21 of the Constitution that this writ shall not be suspended except in case of rebellion or invasion, nor ever without the consent of the Legislature. These sections, aided by the due process section, guard and protect against unwarranted action on the part of any officer, however great. Consequently, and holding as we do in respect to the ultimate authority of review by the judicial department, there is no reason to apprehend irremedial danger to the citizen or his property by the exercise by the Governor of the power and duty, which we here sustain, in seeing, on requisite occasion as he has sought to do in this instance, that the laws are faithfully executed.

We repeat, therefore, by way of summary: That the action of the Governor in ordering out the National Guard, whatever the occasion thereof may be, or, more strictly speaking, what the members of the militia do or may do in pursuance of such an order, is subject to review by the courts at the suit, or other appropriate legal challenge, of any citizen who can show that he has been unlawfully affected in his private personal or private property rights. This inescapably must be true if, as ordained by the Constitution, "the military shall be in strict subordination to the civil power." But we say that under the state of facts here presented the Governor was within his constitutional and statutory power in sending the militia to the area in question, and that in consequence the official members of the militia were lawful civil officers within that area.

Reversed and remanded.